**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHASE MARCONI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 3136 |
| | ) | |
| JO ANNE BARNHART, | ) | Mag. Judge Michael T. Mason |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Chase Marconi ("claimant"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"). The Commissioner denied claimant's claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), 42. U.S.C. §§ 416(i) and 423(d). The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

## BACKGROUND

**Procedural History**

Claimant filed an application for DIB on April 29, 2003, alleging disability since July 6, 2001. (R. 24). Claimant's date last insured was June 30, 2002, the critical date

by which he must establish disability in order to recover benefits. (*Id.*). His claim was denied initially on June 18, 2003 and upon reconsideration on October 8, 2003. (R. 27, 33). Claimant then requested a hearing, which was held on September 30, 2004 before ALJ Cynthia M. Bretthauer. (R. 37, 159). Claimant appeared and testified at the hearing, as did his father, Joseph Marconi and Dr. Daniel Schiff, a psychiatric expert. (R. 159). On November 19, 2004, ALJ Bretthauer issued a written decision denying claimant's request for benefits. (R. 17-23). On March 31, 2005, the Appeals Council denied claimant's request for review and ALJ Bretthauer's decision became the final decision of the Commissioner. (R. 5); *see Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the district court.

**Medical Evidence**

On June 7, 2003, as part of claimant's DIB application, Dr. Robert E. Bussell performed a 45 minute consultative examination on claimant. (R. 131-2). At the outset, Dr. Bussell noted that claimant was 5'9" tall and weighed 140 pounds. (R. 131). Claimant reported that he had lost ten pounds in the last three months. (*Id.*). Dr. Bussell indicated that claimant's affect was depressed, anxiety-laden and disorganized. (*Id.*). Throughout the session, Dr. Bussell observed claimant tapping his knee. (*Id.*). Dr. Bussell noted that claimant's anxiety was significant. (*Id.*). He frequently broke into tears and asked to wait a while before leaving the office after the session was over. (*Id.*). Claimant reported that for the last two to three months, he had been hearing voices telling him not to leave the house. (*Id.*). He also indicated that he has difficultly sleeping due to his fear that people are coming into the house, and he frequently has paranoid dreams. (*Id.*). Claimant denied suicidal ruminations. (R. 132). At the time of

2

the exam, claimant was not on any psychotropic medications nor was he seeing anyone in a medical or psychotherapeutic capacity. (R. 131). Claimant reported taking Tylenol P.M. to sleep. (*Id.*).

Claimant explained to Dr. Bussell that his last employment was Christmas 2002, but that it was short-term. (R. 132). Claimant stated that he left that job because he "can't be with people." (*Id.*). Claimant reported that he had similar episodes in 2000 and since then, his agoraphobia and anxiety about being with people have been growing. (*Id.*).

Dr. Bussell diagnosed claimant with chronic anxiety reaction with agoraphobia and psychotic symptomatology. (*Id.*). Dr. Bussell stated that claimant was extremely distraught and psychologically disturbed. (*Id.*). He reported that claimant's chronic anxiety was "genuinely paralyzing" and that his "psychotic symptomatology merely augments the impetus of his agoraphobia." (*Id.*). Dr. Bussell indicated that claimant appeared clinically depressed. (*Id.*). Dr. Bussell opined that the claimant was "totally unemployable at this time." (*Id.*). The doctor further stated that while medication might remedy the situation somewhat, claimant was not taking any medication. (*Id.*).

On July 8, 2003, Dr. Tomasetti, a State Agency psychologist, reviewed the medical evidence and found that there was insufficient evidence to establish a mental impairment as of June 30, 2002. (R. 133). On September 24, 2003, Dr. Hermsmeyer, a State Agency psychologist, reviewed the evidence and affirmed Dr. Tomasetti's assessment. (*Id.*).

On June 10, 2004, claimant underwent an initial psychological evaluation at Turning Point Behavioral Health Care Center ("Turning Point"). (R. 147). Therapist

Carol R. Cann, LLPC, stated that claimant's symptoms seemed consistent with schizophrenic paranoid type. (*Id.*). She noted that claimant had a history of substance abuse. (R. 147). Though he denied drug abuse, claimant tested positive for cannabis. (R. 150).[1] Ms. Cann suggested that claimant go to the hospital, but he refused. (R. 147). Ms. Cann referred claimant to Dr. Daniel Haycraft. (*Id.*).

On June 15, 2004, Dr. Haycraft performed a psychiatric evaluation of claimant. (R. 148). Dr. Haycraft noted a two year history of severe anxiety, depressed mood and paranoid thoughts that had escalated to the point that claimant felt he was "having a nervous breakdown." (*Id.*). Dr. Haycraft reported that claimant's symptoms included: frequent crying, intense anxiety, decreased appetite, sleep disturbance, isolation to his home and fear of being around people. (*Id.*). Claimant reported a two year duration of auditory hallucinations preceding his other symptoms. (*Id.*). He heard voices telling him to be careful, not to trust anyone, and to watch out. (*Id.*).

Dr. Haycraft noted that there were no suicidal or homicidal intentions. (*Id.*). Claimant had no prior medical history and had not been treated or hospitalized. (*Id.*). Dr. Haycraft noted a family history of schizophrenia in claimant's paternal grandmother. (*Id.*).

Dr. Haycraft described claimant's appearance as disheveled. (*Id.*). At the time of the evaluation, claimant was very anxious and agitated. (*Id.*). Dr. Haycraft observed tremors and leg shaking. (*Id.*). He indicated that claimant suffered from auditory hallucinations and paranoid delusions. (*Id.*). Dr. Haycraft noted that claimant's affect

---

[1] The Turning Point records also reflect a pending warrant for a DUI.

was frightened and labile and his mood was anxious and depressed. (*Id.*). Dr. Haycraft diagnosed claimant with schizoaffective disorder - acute with inability for self-care. (R. 148). Due to the severity of claimant's symptoms, Dr. Haycraft recommended hospitalization and notified emergency services, but claimant left prior to their arrival. (*Id.*).

The staff at Turning Point followed up with claimant's family the next day. (R. 151-153). On June 16, 2004, claimant's mother reported that, at that time, claimant did not have the symptoms the staff witnessed during the evaluation. (R. 153). Claimant's mother did not wish to have her son hospitalized but she did want to see him put on medication. (*Id.*).

**Claimant's Testimony**

Claimant testified at the hearing held on September 30, 2004. Claimant explained that he lives with his parents in their apartment. (R. 164). He receives no income or food stamps. (R. 165). He has an eighth grade education and no GED. (*Id.*). Claimant does not have a current driver's license.[2] (*Id.*). He relies on his parents to take him on errands. (R. 165-66).

Claimant explained that he quit a maintenance job in 2000 because it was "[p]retty far from home and [he] didn't have a vehicle to get [there]." (R. 167). Claimant did not recall whether he was hearing voices or was paranoid at that time. (R. 176). He testified that he did not think that he could handle that kind of job now. (R. 167).

Claimant returned to work in November 2002, at J.C. Penney. (R. 167-68).

---

[2] Claimant testified that he did not recall being stopped and charged with driving under the influence. (R. 165).

Claimant testified that, at the time, he thought that he was going through something and just needed to get out for a while. (R. 177). He said that when he returned to work, that was when things got worse. (*Id.*). Claimant explained that the crowds were annoying and that he did not feel comfortable or safe. (*Id.*). He said that he realized that he "just couldn't do it anymore"; he couldn't "be around certain people." (R. 167-8). He further testified that he "really couldn't handle it." (R. 177). Claimant quit the J.C. Penney job after a month and since then, has remained unemployed. (R. 168). Claimant testified that he could not even handle a job where he did not have to be around people because he did not think he could make it to the job on his own. (*Id.*).

Claimant went to Turning Point in June 2004, after his attorney suggested he find free treatment at a local center. (R. 168, 170, 178). He said that prior to June 2002, he did not see any kind of doctor, psychiatrist, social worker or therapist. (R. 170). Claimant testified that he did not seek help sooner because he had no money or insurance. (*Id.*). He went to Turning Point because he thought they could prescribe him medication which could help him. (R. 171).[3] While claimant was at Turning Point, they tried to get him to check into the hospital. (R. 169). He explained that he agreed to consider going to the hospital at some point, maybe after his parents were able to talk to him and calm him down. (*Id.*). At the time, claimant did not know that he could leave the hospital if it was not working out for him. (*Id.*). Claimant said that he got scared, panicked and left. (*Id.*).

Claimant testified that he does not do much during the day. (R. 171). He never

---

[3] At the time of his hearing, claimant was only taking Tylenol P.M. He testified that he took the Tylenol P.M. to help him sleep at night. (R. 171).

6

leaves the house, and does not do any of the household chores. (*Id.*). He bathes every other day. (*Id.*). Claimant testified that he never goes to religious services or leaves the house on his own. (R. 173, 175). He said that his sister and brother visit him at his parents' house but he does not leave to visit friends and family. (R. 173-74). Claimant testified that he feels paranoid and stays up all night pacing in his bedroom, looking out the window and watching the door. (R. 172). He said that he feels like something is going to happen, and he "just wants to be up for it." (*Id.*).

Claimant explained that his symptoms have gotten worse over the past two years. (*Id.*). He testified that he has crying spells throughout the day. (*Id.*). He admitted having had suicidal thoughts but said that he never attempted suicide. (R. 173). He gets along with his parents but has trouble getting along with other people. (*Id.*). Claimant testified that he hears voices throughout the day and night telling him "to be on guard." (*Id.*). Claimant also testified that he occasionally drinks alcoholic beverages to help him fall asleep. (R. 189). The last time claimant drank alcohol was a couple of weeks before the hearing. (*Id.*). He said that he gets it on the streets. (*Id.*). He testified that there are times when he takes money from his parents to buy the alcohol. (R. 190). Claimant further testified that sometimes he uses marijuana. (*Id.*). He most recently used it two months before the hearing. (*Id.*). Again, he buys the marijuana on the streets. (R. 191). Claimant explained that sometimes he takes a bus into the city to buy the drugs. (*Id.*). He said that he leaves his house to do this maybe once a month or once every other month. (*Id.*).

**Claimant's Father's Testimony**

Claimant's father, Joseph Marconi ("Mr. Marconi"), also testified at the

7

September 30, 2004 hearing. He testified that he had witnessed his son's condition worsen over the past three years. (R. 180). According to Mr. Marconi, in the past three years, claimant has become more afraid of things and paranoid. (*Id.*). He rarely leaves his room and he is up at night looking out the windows and checking the doors. (*Id.*). Mr. Marconi has noticed that claimant has been talking to himself more often but claimant denies it if Mr. Marconi asks him about it. (R. 181). Mr. Marconi has tried to involve his son in more activities around the house, but claimant will only do them if Mr. Marconi or his wife are there. (R. 180). Mr. Marconi explained that he and his wife have to remind claimant to wash and shave but he will take care of himself if they remind him. (R. 180-81).

Mr. Marconi also testified that certain people bother the claimant. (R. 180). He is afraid of physicians because of one negative experience he had at Turning Point. (*Id.*). Moreover, he feels people are "plotting against him, ganging up on him, and wanting to take him into the hospital." (*Id.*).

Mr. Marconi testified that prior to three years ago, claimant had a life. (R. 181). He had a wife and children. (*Id.*). Mr. Marconi said that after claimant's wife left him, everything sort of went downhill. (R. 181-82). He thought that she left about four years or more before the hearing. (R. 182).

Mr. Marconi explained that he and his wife tried to get claimant help but he is not covered by their insurance. (*Id.*). He said he did not consider taking claimant to Cook County because he had heard horror stories about it. (*Id.*). After the experience at Turning Point, Mr. Marconi said that he just wanted to get claimant a physician that he feels comfortable with. (R. 183). After his son left Turning Point, Mr. Marconi tried to

get claimant a doctor. (R. 185). However, every doctor he talked to wanted insurance or money, which he did not have. (*Id.*). Mr. Marconi also tried self-help. (R. 183). He tried to convince his son that he was okay and that he was safe. (*Id.*).

Mr. Marconi testified that there is a family history of mental illness. (*Id.*). Claimant's grandmother is schizophrenic and takes Haldol. (*Id.*).

Mr. Marconi said that he used to play baseball and basketball with claimant. (R. 187). However, the last time Mr. Marconi remembers engaging in any normal activities with his son was at least three to four years ago. (*Id.*).

Mr. Marconi further testified that he does not think his son leaves the house by himself. (R. 188). He explained that claimant might take a walk in the front yard or take the garbage out but then he comes right back in. (*Id.*). Mr. Marconi said that, "If I tell him to do something, he'll do it. If I'm there, I see he's comfortable, he's fine. When I leave, he wants to leave too." (*Id.*).

According to Mr. Marconi, claimant used to take drugs and drink alcohol but he no longer does it in their house. (*Id.*). There is no liquor in the house. (*Id.*). Mr. Marconi said that if claimant is drinking, he did not know how. (*Id.*). He did not know if claimant had ever been charged with a DUI. (*Id.*).

**Medical Expert**

Dr. Daniel Schiff, a qualified psychiatric expert, also testified at the September 30, 2004 hearing. After reviewing the medical evidence and hearing testimony from the claimant and his father, Dr. Schiff asked claimant some questions. (R. 193). Specifically, Dr. Schiff asked claimant whether he has had trouble with dope dealers and whether they could be "after" him. (*Id.*). Claimant admitted that it was possible that

9

they had been after him in the past, but he did not know whether anybody was currently after him. (*Id.*).

Dr. Schiff explained that there was not sufficient information or objective evidence in the file or through testimony for him to render an opinion as to claimant's impairment. (R. 194). In particular, Dr. Schiff testified that he had no reliable information for the time period before June 30, 2002. (*Id.*). With respect to claimant's condition at the time of the hearing, Dr. Schiff stated that "there's insufficient consistent information to make any psychiatric diagnosis." (*Id.*). The doctor noted that claimant tested positive for marijuana use at Turning Point in June 2004, yet he denied drug abuse. (R. 195). Dr. Schiff observed that the day after the evaluation, claimant's mother reported that he was not presenting with the symptoms witnessed by the staff during the evaluation. (*Id.*). He equated this report with a denial of symptoms. (*Id.*). Dr. Schiff testified that he was aware of what Dr. Bussell found but stated that Dr. Bussell's report did not discuss claimant's possible chemical abuse. (*Id.*). Therefore, Dr. Schiff said that he could not render a consistent opinion. (*Id.*).

Dr. Schiff suspected that, despite claimant's denials, drugs and alcohol were a significant factor. (*Id.*). He explained that marijuana is always subject to contamination and that sometimes it is dipped in any number of medications, contaminants or substances of abuse. (*Id.*). He testified that the picture claimant presented with at Turning Point may have been a result of marijuana adulterated in some chemical. (*Id.*). Dr. Schiff recognized that this theory was speculative. (R. 196). Dr. Schiff also mentioned that, according to the experts, you cannot make an independent affective disorder diagnosis unless the person has been free of substances of abuse from four to

eight weeks. (R. 198).

Dr. Schiff admitted that he did not know what claimant's physical medical problems were or where he would be at psychiatrically because he had never examined claimant. (R. 200). The doctor suggested that there would need to be a long period of time where claimant was free from all chemicals of abuse and was undergoing consistent treatment before he would know something about claimant's problems and how he responded to medication. (R. 199).

**LEGAL ANALYSIS**

**I.     Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. *42 U.S.C. § 405(g)*; *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to her conclusion," she need not discuss every piece of evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must

11

"sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## II.     Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether the claimant is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176.

The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). The claimant bears the

12

burden "at step one of showing that he is not working, at step two that he has a medically severe impairment or combination of impairments, and at step four that the impairment prevents him from performing his past work." *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Zurawski*, 245 F.3d at 886. However, if the process ends at step two, the burden of proof never shifts to the Commissioner. *Bowen*, 482 U.S. at 146 n. 5.

The ALJ followed this five-step analysis. At step one, the ALJ reserved a finding as to whether the claimant has engaged in any disqualifying substantial gainful activity. (R. 18, 22). According to the ALJ, it was unclear from the available evidence whether claimant's brief return to work in the winter of 2002 constituted disqualifying gainful activity or an unsuccessful work attempt. (R. 18). In any event, she did not disqualify claimant based on step one.

At step two, the ALJ found that there was "nothing in the medical evidence to establish that the claimant had a medically determinable impairment(s) on or about June 30, 2002." (R. 18, 22). The ALJ stated that claimant did not have a "severe impairment" or combination of impairments during the critical period. (R. 22). She further found that claimant's allegations of disabling symptoms and limitations on or about June 30, 2002 were not credible. (R. 20-22). Accordingly, the ALJ found that claimant was not under a "disability" for purposes of Title II of the Social Security Act at any time through June 30, 2002. (R. 22). Because a finding adverse to the claimant at this step bars his claim for benefits, the ALJ did not need to proceed to the next step in

13

the analysis. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

Claimant argues that the ALJ erred in finding him not disabled because: (1) she failed to apply the requirements of Social Security Ruling 83-20 in determining the onset of claimant's disability; (2) she failed to properly apply Social Security Ruling 96-7p when she discredited claimant's and Mr. Marconi's testimony for lack of medical evidence; and (3) she gave insufficient weight to the opinions of the treating and examining physicians and failed to re-contact medical sources for further elaboration on claimant's alleged disabilities.

## A. The ALJ's Findings Are Supported By Substantial Evidence

The ALJ's findings will be affirmed only if they are supported by substantial evidence. *Diaz*, 55 F. 3d at 305. At step two, the claimant must show that he has a medically severe impairment or combination of impairments. *Bowen*, 482 U.S. at 146 n. 5. Here, claimant was required to establish that he had a medically severe impairment as of his date last insured, June 30, 2002. *See Hughes v. Chater*, 895 F. Supp. 985, 992 (N.D. Ill. 1995).

If the claimant does "not have any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities," we will find that the claimant does not have a severe impairment. *See* 20 C.F.R. § 404.1520(c). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."[4] 20 C.F.R. § 404.1508; *see also*, 20 C.F.R. §

---

[4] "Symptoms are [the claimant's] own description of [his] physical or mental impairment." 20 C.F.R. § 404.1528(a). Signs are anatomical, physiological, or psychological abnormalities

404.1529(b); SSR 96-3p.

The ALJ concluded that there was nothing in the medical evidence to establish that the claimant had a medically determinable impairment on or about June 30, 2002. (R. 22). We agree. There are no signs or laboratory findings that demonstrate that the claimant suffered from any medically determinable impairment or combination of impairments prior to the expiration of his insured status. As ALJ Bretthauer noted, the record is void of any medical evidence prior to June 2003. (R. 19). The ALJ also noted that Dr. Schiff testified that there is no objective evidence of an identifiable impairment on or about June 30, 2002. (*Id.*).

The only evidence of a medically determinable impairment that claimant offered was his testimony and his father's testimony about his symptoms. However, symptoms will not be found to affect an individual's ability to do basic work activities unless the individual first establishes by objective medical evidence, *i.e.*, signs and laboratory findings, that he has a medically determinable physical or mental impairment that could reasonably be expected to produce the alleged symptoms. SSR 96-3p; 20 C.F.R. § 404.1529(b). Regardless of how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities. SSR 96-4p. Furthermore, where "there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual

---

that must be shown by clinical diagnostic techniques. 20 C.F.R. § 404.1528(b). "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." 20 C.F.R. § 404.1528(c).

15

must be found not disabled at step 2 of the sequential evaluation process." SSR 96-4p.

Because the claimant failed to demonstrate the existence of a medically determinable impairment prior to his date last insured, the ALJ found, as she was required to, that the claimant did not have a severe impairment and therefore, was not under a "disability" as defined by the Social Security Act. (R. 19-22); SSR 96-4p. The ALJ's opinion allows us to trace the path of her reasoning and demonstrates that she considered the important evidence. *Carlson*, 999 F.2d at 181. Therefore, we find that the ALJ's decision is supported by substantial evidence.

**B.     Social Security Ruling 83-20 Is Inapplicable**

Social Security Ruling 83-20 generally governs the process of determining the onset of an individual's disability. SSR 83-20. Claimant argues that the ALJ erred because she failed to apply the requirements of SSR 83-20 in determining the onset of his disability. In particular, claimant argues that his testimony and his father's testimony, along with corroborating medical evidence from Dr. Bussell and Dr. Haycraft, should have prompted the ALJ to draw reasonable inferences for the period of time prior to June 30, 2002.

However, the Seventh Circuit has specifically stated that "SSR 83-20 addresses the situation in which an administrative law judge makes a finding that an individual is disabled as of an application date and the question arises as to whether the disability arose at an earlier time." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). The *Scheck* court held that SSR 83-20 did not apply because the ALJ did not find that the claimant was disabled. *Id.* As in *Scheck*, here, the ALJ never found that the claimant was disabled. (R. 17-23). Accordingly, there was no need to determine an onset date.

Because SSR 83-20 does not apply, there is no reason to remand on this basis.

**C.     The ALJ's Credibility Determination**

Next, claimant argues that the ALJ failed to properly apply Social Security Ruling 96-7p when she discredited claimant's and his father's testimony for lack of medical evidence.  Specifically, claimant contends that the ALJ failed to discuss any factors negatively impacting his credibility other than the lack of objective medical evidence.  Claimant also argues that the ALJ erred because the only basis she provided for rejecting his father's testimony was their close relationship.

However, once the ALJ concluded that the claimant had failed to prove he had a medically determinable impairment, the ALJ was not required to consider the testimony concerning claimant's symptoms because that testimony by itself could not support a finding of disability.  *See Cook v. Massanari,* 2001 U.S. Dist. LEXIS 9195, *21 (N.D. Ill. 2001)(recognizing that only after the initial finding of an objectively verifiable abnormality is made, does the ALJ begin looking at the claimant's symptoms); SSR 96-7p (stating that no symptom or combination of symptoms can be the basis for a finding of disability unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms); *see also*, SSR 96-3p; SSR 96-4p.

Additionally, this Court was not persuaded by claimant's argument that his testimony was supported by both his father's testimony *and* medical evidence.  Simply put, claimant's testimony about his symptoms was not supported by any objective medical evidence.  Indeed, there was no medical evidence prior to 2003 and neither Dr. Bussell nor Dr. Haycraft offered a retroactive diagnosis or any other opinion concerning

17

claimant's condition as of his date last insured.  Furthermore, two State Agency psychologists and the medical expert, Dr. Schiff, found that there was insufficient evidence to establish a mental impairment as of June 30, 2002.

Moreover, "no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).  Because there are no medical signs or laboratory findings demonstrating the existence of a medically determinable physical or mental impairment prior to June 30, 2002, there is no reason to believe that a remand might lead to a different result.  Based on the foregoing, we will not remand for further consideration of claimant's or his father's testimony.

**D.      Weight Afforded to the Medical Opinions**

Finally, claimant argues that ALJ Bretthauer failed to explain why she gave more weight to Dr. Schiff's opinion than to the opinions of the treating and examining sources (Dr. Bussell, Dr. Haycraft and therapist Cann).  Dr. Schiff testified that he could not render an opinion as to whether claimant had any mental impairment as of June 30, 2002 because there was no reliable information for the time period before that date.  (R. 194).  However, neither Dr. Bussell, Dr. Haycraft nor therapist Cann offered an opinion with respect to whether the claimant had a severe impairment on or about June 30, 2002.  Thus, this is not a case that involves conflicting medical opinions.  Because none of the treating or examining sources offered any opinions about claimant's condition as of his date last insured, it was perfectly reasonable for the ALJ to rely on Dr. Schiff's opinion.

18

Furthermore, contrary to claimant's suggestion, the issue of his substance abuse has absolutely no bearing on whether claimant had a severe mental impairment as of his date last insured. Dr. Schiff testified that there was insufficient consistent information to make a psychiatric diagnosis regarding claimant's condition at the time of the hearing in September 2004. (*Id.*). Dr. Schiff discussed the fact that Dr. Bussell's report did not evaluate claimant's substance abuse. (R. 195). Claimant contends that the ALJ failed to analyze the importance of Dr. Haycraft and therapist Cann's opinions given that they knew of claimant's substance use. According to claimant, the ALJ's reliance on Dr. Schiff's opinion was improper because she should have afforded the examining sources greater weight where all three were consistent and at least one took into account claimant's drug use. Claimant also argues that the ALJ should have re-contacted the treating sources, pursuant to 20 C.F.R. 404.1512(e), if it was unclear what claimant's impairments were with or without drug use.

However, claimant ignores the fact that it was his burden to demonstrate that he had a severe impairment on or before June 30, 2002 - not at the time of the September 2004 hearing. *Meredith v. Bowen*, 833 F.2d 650, 652 (7th Cir. 1987) (recognizing that in order to receive Title II disability insurance benefits, claimant had to prove that she was disabled on or before the date that her insured status expired); *see also, Hughes*, 895 F. Supp. at 992. Because claimant failed to meet his burden, the ALJ properly found that he was not under a disability for purposes of Title II of the Social Security Act at any time through June 30, 2002. (R. 22). Based on the foregoing, a remand for further consideration of the medical evidence is not warranted.

**CONCLUSION**

For the reasons set forth above, claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted. The decision of the ALJ is affirmed. It is so ordered.

ENTER:

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: October 12, 2006**